UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

GENA LOUISE BRANNON, §
§
     Plaintiff, §
§
VS. § CIVIL ACTION NO. 2:17-CV-120
§
NANCY A BERRYHILL, §
§
     Defendant. §

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, VACATING THE OPINION OF THE COMMISSIONER, AND REMANDING THIS CASE FOR FURTHER PROCEEDINGS

Gena Louise Brannon filed a complaint seeking reversal of the decision of the defendant Commissioner of Social Security (Commissioner) for the purpose of receiving Disability Income Benefits (DIB) and Social Security Disability Insurance (SSDI). Plaintiff filed a motion and brief in support of her application on September 11, 2017 and Defendant filed a response brief in support of the Commissioner's determination on October 24, 2017 (D.E. 13, 14). Plaintiff filed a reply and an amended reply to the Commissioner's response on November 9, 2017 (D.E. 15, 16). For the reasons discussed below, it is ordered that the Commissioner's decision be vacated and Plaintiff's cause of action be remanded to the Social Security Administration for further proceedings.

## BACKGROUND

Plaintiff filed an application for DIB on January 21, 2014 and an application for SSDI on January 24, 2014, alleging an onset date of June 1, 2013 (Tr. 190-204; D.E. 6-6 at pp. 2-16). The application was denied at all levels of the administrative process (Tr.

60-81, 84-111, 10-25, 1-6; D.E. 6-4 at pp. 2-23, 26-53; D.E. 6-3 at pp. 11-26, 2-7).

Plaintiff filed this civil action seeking reversal of the administrative law judge (ALJ) decision on March 30, 2017 (D.E. 1).

Plaintiff alleges that she has been unable to work since June 1, 2013 because of heart failure, a heart murmur, endocarditis, bipolar disorder, and schizophrenia (Tr. 60; D.E. 6-4 at p. 2). Her reported symptoms include weakness, shortness of breath, chest pain, depression, hearing voices, confusion, forgetfulness, tearfulness, and mood swings (Tr. 227-228, 231-232; D.E. 6-7 at pp. 16-17, 20-21). Prior to the onset of her disability, Plaintiff worked as a home health aide, a waitress, and a crew member in a fast food restaurant (Tr. 219; D.E. 6-7 at p. 9).

## MEDICAL EVIDENCE

In 2013, following complaints of fever, chills, and cough, it was determined that Plaintiff had mitral valve endocarditis with mitral regurgitation (Tr. 340; D.E. 6-8 at p. 57). On June 21, 2013 Plaintiff underwent surgery for mitral valve repair (Tr. 331-332; Tr. 6-8 at pp. 48-49). In addition, it was determined that Plaintiff had a MRSA infection, MRSA septicemia, and MRSA endocarditis of the mitral valve. Following surgery, she underwent a six-week course of IV antibiotics. She was discharged home in stable condition and not on any medications (Tr. 334; D.E. 6-8 at p. 51).

In December 2013 Plaintiff reported to Coastal Plains Community MHMR Center that she was depressed and was hearing people talking and seeing people walking through her house. The hallucinations began after her heart surgery. She had mood

swings and was afraid to go outside or go anywhere by herself. She had previously been addicted to alcohol and cocaine but was not presently using (Tr. 387; D.E. 6-9 at p. 5).

In January 2014 Plaintiff reported hearing voices and seeing "shadow people." She stayed home all the time because she feared something bad was going to happen. The voices started after her surgery and she had been sad every day since her surgery. Her primary care physician had prescribed Trazadone and Sertraline but the Trazadone made her heart race and she did not like to take it. She did not have insurance and was not able to see the doctor regularly (Tr. 386; D.E. 6-9 at p. 4).

She became nervous and her heart started beating fast if someone got too close to her. She used to like to go places but had lost interest in going anywhere. She did not like to bathe or get dressed because she did not want to get out of bed. She did not want to die, but had thought about driving into traffic. She always felt tired and had a difficult time concentrating. She was depressed before the surgery, but her symptoms worsened after the surgery. She could not concentrate or stick to a task. Plaintiff reported that she had been diagnosed with bipolar disorder fifteen years previously and had been prescribed lithium. She used to get mad easily, but no longer did that (*Id.*).

Her mental status examination showed that she was disheveled but appropriately dressed and groomed; she was alert and made good eye contact; she was described as cooperative, depressed, anxious, terrified, and confiding. She was oriented to time, place, and person and had remote and immediate recall. She was able to follow the conversation and her speech was normal. Her insight and judgment were fair and she had no suicidal ideation or desire to hurt others (Tr. 391-392; D.E. 6-9 at pp. 9-10). She was

diagnosed with "major depress d/o single episode mi; mental dis. nos due to med." and cannabis abuse (Tr. 393; D.E. 6-9 at p. 11).

On February 6, 2014 Plaintiff underwent a psychiatric assessment by a psychiatrist, U. Maruvada, M.D., at the Beeville Mental Health clinic. Her chief complaint was depression and hearing voices. She was sad and felt like crying. She heard voices that told her that she was not good for anything and should kill herself. She heard the voices when she was alone so she tried to spend time at her sister's house. She denied drinking or abusing drugs. She had no thoughts of suicide or homicide. She had never received psychiatric treatment or counseling although her primary care physician had prescribed one month of Zoloft when she was in the hospital with heart problems (Tr. 417; D.E. 6-9 at p. 35).

Her mental status examination was normal except for a depressed mood with appropriate affect. Her memory was fair without cognitive defects and her insight and judgment were fair. Dr. Maruvada assessed Plaintiff with a major depressive disorder, single episode, severe, with psychotic features and polysubstance abuse in full sustained remission. He assigned her a current GAF[1] of 38 and her past year GAF was unknown. He prescribed Lexapro 10 mg. and Abilify 5 mg. (Tr. 418; D.E. 6-9 at p. 36).

---

[1] The Global Assessment of Functioning ("GAF") scale rates overall psychological functioning on a scale of 0-100. A GAF of 31 to 40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., 2000. The American Psychiatric Association dropped the GAF Scale in favor of the World Health

In April 2014 Plaintiff saw Dr. Maruvada again and reported that the medications seemed to be helping, but she was still depressed, could not sleep, and had difficulty concentrating. Her mood was dysthymic, but her mental status examination was otherwise normal. She also reported using cocaine sometimes. Her Lexapro dosage was increased and she was prescribed Wellbutrin. She was advised to stop using cocaine completely (Tr. 408-410; D.E. 6-9 at pp. 26-28).

Plaintiff underwent a consultative psychiatric examination by psychiatrist Raul Capitaine, M.D., on May 15, 2014. Plaintiff reported that she could not work because of her heart surgery and that she cried all day, two or three days per week. She isolated herself from others and was always nervous, especially around groups of people. She had trouble sleeping at night and would sleep all day. She did not finish things and said she had last been manic a couple of weeks before the interview. Plaintiff reported that she had twice been hospitalized as a teenager for inpatient evaluations (Tr. 378-379; D.E. 6-8 at pp. 95-96).

Plaintiff lived with her boyfriend of ten years and her sister lived next door. She had decreased motivation to bathe but was able to dress herself. Plaintiff's sister shopped, cooked, managed money, and took Plaintiff to her appointments. Plaintiff once left the water on and flooded the kitchen. Plaintiff tried to do laundry but her sister

Organization Disability Assessment Schedule (WHODAS) 2.0. *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)(DSM-5); *Braswell v. Berryhill*, No 5:16-CV-033-BQ, 2017 WL 881109, n. 1 (N.D. Tex. 2017). However, because Plaintiff's mental health care providers assessed her with reference to the GAF Scale, and because the ALJ mentioned the GAF numbers in the record, they are included here.

usually ended up doing it. Other than her boyfriend and her sister, Plaintiff did not have friends. Plaintiff typically did not finish tasks and had difficulty with motivation. She cried and paced when upset (Tr. 379; D.E. 6-8 at p. 96).

Plaintiff was described as nervous but cooperative. Her speech was normal at times and other times she used baby talk. Her thinking was goal directed and she had no delusions. She reported hallucinations, seeing or hearing a man tell her that her deceased mother wanted her to come, but she knew it was not true. Her mood was down and her affect was flat. She made good eye contact and was oriented times four (Tr. 380; D.E. 6-8 at p. 97).

Her remote memory was intact but her immediate memory was impaired. Her concentration was good as she was able to recall serials of 3s with no problems but had some difficulties with serials of 7s. Her judgment was poor at times but she was able to ask her sister for help. She recognized that she had symptoms of bipolar disorder, depression, and anxiety, was compliant with her psychiatric treatment, and took her medication as prescribed. She could not afford to see her doctor for treatment and refills on her medication (Tr. 380-381; D.E. 6-8 at pp. 97-98).

Dr. Capitaine assessed Plaintiff with bipolar disorder with depression and a generalized anxiety disorder. He assigned her a GAF of 50[2] and found her prognosis to be limited. Regarding her functional capacity, he found that she could not consistently understand, carry out, and remember instructions because of her crying, depression,

---

[2] A GAF of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

mania, and anxiety. She could sustain concentration on a good day but not on a bad day. She could not participate in work related activity at a reasonable pace because of the open heart surgery, which caused her to tire easily and become short of breath. She could not maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public because she tended to isolate and had difficulty following through with tasks. She could not deal with normal pressures in a competitive work setting (Tr. 381; D.E. 6-8 at p. 98). Dr. Capitaine believed Plaintiff could understand the meaning of filing for benefits but could not manage benefit payments in her own interest (Tr. 382; D.E. 6-8 at p. 99).

In July 2014 Plaintiff reported to Dr. Maruvada that she was "doing ok" and had been off her medications for a while. She had stopped drinking and using cocaine cold turkey. She was still depressed and could not concentrate but was better than she had been the previous month. She also continued to have trouble sleeping. Her mental status examination was normal except that her mood was dysthymic. Also Dr. Maruvada noted that her ability to concentrate was impaired and she was distracted (Tr. 395-397; D.E. 6-9 at pp. 13-16).

In September 2014 Plaintiff was admitted to the hospital with worsening shortness of breath, fatigue, occasional chest discomfort, and intermittent low grade fever (Tr. 425-426; D.E. 6-9 at pp. 43-44). On September 19, 2014 she underwent a mitral valve replacement following a diagnosis of recurrent infection of the mitral valve (Tr. 492; D.E. 6-10 at p. 64). Following the surgery she received a six-week course of IV antibiotics. She also was prescribed Xanax and Ambien for anxiety and insomnia (Tr. 433; D.E. 6-10

at p. 5). She was discharged from the hospital on November 6, 2014, but prior to discharge a chest X-ray revealed lower left atelectasis with suspicion for consolidation and she was started on Augmentin (Tr. 435-436; D.E. 6-10 at pp. 7-8).

In April 2015 Plaintiff reported to Dr. Maruvada that she had sad days and happy days and that she also had panic attacks. She had broken up with her boyfriend. She reported being sad, unmotivated, fatigued, anxious, and had lost interest in things. Her mood was dysthymic (Tr. 554-555; D.E. 6-11 at pp. 38-39). Plaintiff saw Dr. Maruvada again in June 2015, and her mood was euthymic. Dr. Maruvada completed a "medical release/Physician's statement" and noted that Plaintiff was permanently disabled by a major depressive disorder (Tr. 507, 551; D.E. 6-10 at p. 79, D.E. 6-11 at p. 35).

## HEARING TESTIMONY

Plaintiff, represented by counsel, attended a hearing on January 12, 2016. She was forty-three years old and lived by herself (Tr. 34-35; D.E. 6-3 at pp. 35-36). She went to school through the eleventh grade, obtained a GED, and attended two years of community college (Tr. 35; D.E. 6-3 at p. 36). Her sister supported her financially and she also received food stamps and assistance with her electric bill (Tr. 36; D.E. 6-3 at p. 37).

Plaintiff had previously worked as a fast food restaurant shift manager, a home health aide, and a waitress at a restaurant. She stopped working at the restaurant when it closed permanently (Tr. 37-38; D.E. 6-3 at pp. 38-39).

Since her first open-heart surgery Plaintiff had experienced shortness of breath with walking and exertion such as cleaning house, folding clothes, bathing, and dressing

herself.  She also had sharp pains in her chest two or three times per week and almost daily back pain that she relieved by taking Aleve and lying down (Tr. 40-41; D.E. 6-3 at pp. 41-42).

Plaintiff had bipolar disorder and often felt angry and irritable.  She had mood swings and could feel very happy and then very angry for no reason.  Her mood changed two or three times per week.  Having people show up at her house caused her mood to change because she did not like to be around anyone but her sister.  She cried a lot and often felt overwhelmed.  When she traveled by car she was afraid that she was going to die in a crash.  She did not trust anyone but her sister and was happiest when she was alone in her house (Tr. 42-43; D.E. 6-3 at pp. 43-44).  Her sister lived next door to Plaintiff.  She kept Plaintiff's medications at her house and gave them to Plaintiff when she was supposed to take them because otherwise Plaintiff would forget.  Her sister also kept track of Plaintiff's medical appointments (Tr. 44-45; D.E. 6-3 at pp. 45-46).  Plaintiff took care of her own grooming, but when depressed, her sister would remind her to bathe every two or three days and also made her get out of the house (Tr. 45-46; D.E. 6-3 at pp. 46-47).  She occasionally had panic attacks and would begin to hyperventilate.  Conflict with other people could trigger a panic attack (Tr. 46-47; D.E. 6-3 at pp. 47-48).

Plaintiff cooked for herself occasionally, but mostly ate microwave meals.  She tried to do housework but became distracted and did not finish tasks.  Her sister and two friends would come over and help her with household tasks sometimes.  It made her sad that she could not take care of her chores (Tr. 48-50; D.E. 6-3 at pp. 49-51).

She could walk for approximately forty-five minutes, but her back would start to hurt before then. She had to change positions often between sitting, standing, and lying. She could lift and carry between ten and twenty pounds (Tr. 50-51; D.E. 6-3 at pp. 51-52). She did not believe she could work full time because when she was around other people she felt panicky and began to cry. Even if she were supposed to work five days per week she did not believe she would be able to show up to work more than two or three days in a week (Tr. 51-52; D.E. 6-3 at pp. 52-53).

The vocational expert (VE) testified that Plaintiff's jobs as a fast food worker and waitress were light and unskilled. Her job as a home health provider was medium with an SVP[3] of three, but none of the skills required in that job would transfer to other kinds of jobs. The ALJ described a person to the VE of the same age, education and past work experience as Plaintiff. The person would be limited to light work and could only occasionally climb ramps and stairs but never ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch, crawl, balance, and bend. She would need to avoid all concentrated exposure to irritants such as fumes, odors, dust, gasses, and poorly ventilated areas. She would need to avoid all exposure to unprotected heights and hazardous machinery. She would be limited to detailed but not complex work with only occasional and brief interaction with the public (Tr. 54-55; D.E. 6-3 at pp. 55-56).

---

[3] "SVP" stands for Specific Vocational Preparation, which is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. An SVP of 3 is "Over 1 month up to and including 3 months." http://www.occupationalinfo.org/appendxc_1.html (last viewed March 12, 2018).

The VE testified that such a person could not do any of Plaintiff's past work, but could do the jobs of assembler of small products, marker in the retail trade industry, and stamping machine operator. All of the jobs were light in exertion, unskilled with an SVP of two,[4] and existed in significant numbers in the national economy. If the person, primarily due to emotional difficulties, missed either part of a day or a full day of work once or twice per week, she would not be able to maintain employment (Tr. 55-56; D.E. 6-3 at pp. 56-57). If the findings of Dr. Capitaine that Plaintiff could not participate in work-related activity at a reasonable pace and could not deal with normal pressures in a competitive work setting were taken into account, Plaintiff would not be able to maintain employment (Tr. 57; D.E. 6-3 at p. 58).

## ALJ DETERMINATION

In the decision issued on February 3, 2016, the ALJ found that Plaintiff met the insured status requirements until December 31, 2018 and that she had not engaged in substantial gainful activity since her alleged onset date of June 1, 2013. He further found that she had the following severe impairments: bipolar disorder, anxiety disorder, and heart failure, but that none of her impairments met or medically equaled a listed impairment.

The ALJ next determined that Plaintiff had the residual functional capacity (RFC) to perform light work with the additional restrictions that he described in his first hypothetical to the VE at the hearing. He then found that Plaintiff could not perform her

---

[4] An SVP of 2 is "Anything beyond short demonstration up to and including 1 month." *Id.*

past relevant work, but that she could perform the jobs described by the VE at the hearing and they existed for her in significant numbers in the national economy (Tr. 14-25; D.E. 6-3 at pp. 15-26).

Plaintiff objects to the ALJ's findings and argues that if the ALJ had given proper weight to the opinion of Dr. Capitaine, the consultative examiner, he would have found that Plaintiff had greater mental limitations than he listed in his RFC assessment. In particular, Plaintiff objects to the ALJ's finding that she could perform sustained work activities in an ordinary work setting on a regular and continuing basis, and to his finding that Plaintiff could do detailed, but not complex work with occasional and brief interaction with the public. Defendant counters that the ALJ properly weighed the conflicting medical opinions in the record and properly determined Plaintiff's RFC.

## LEGAL STANDARDS

### A. Judicial Review

Judicial review of the Commissioner's decision regarding a claimant's entitlement to benefits is limited to two questions: (1) whether substantial evidence supports the Commissioner's decision; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The burden has been described as more than a scintilla, but lower than a preponderance. *Taylor v. Astrue*, 706 F.3d 600, 602 (5th Cir. 2012). "Substantial evidence is more than 'a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only

where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Marcantel v. Chater*, 58 F.3d 637 at *1 (5th Cir. 1995)(not selected for publication)(citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

In applying the substantial evidence standard, the Court scrutinizes the record to determine whether such evidence is present. But the Court does not reweigh the evidence, try the issues de novo, or substitute its judgment for that of the Commissioner. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Conflicts of evidence are for the Commissioner rather than the courts to decide. *Id.* It is incumbent upon the Court to look at the evidence as a whole and take into account the following factors: (1) objective medical evidence or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and others who have observed him and (4) the claimant's age, education and work history. *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)(citations omitted).

In evaluating a disability claim, the Commissioner follows a five-step sequential process to determine whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in the appendix to the regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work. *Martinez v. Chater*, 64 F.3d 172, 173-174 (5th Cir. 1995); 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps with the burden shifting to the Commissioner at the fifth step. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

## B.  Residual Functional Capacity

A claimant's RFC is the most she can do in a work setting when her impairments and any related symptoms which result in physical and mental limitations are taken into consideration.  20 C.F.R. § 404.1545(a)(1).  The adjudicator considers all of a claimant's medically determinable impairments, including those that are not "severe," and assesses whether she can meet the physical, mental, sensory, and other requirements of work.  20 C.F.R. § 404.1545(a)(2)-(4).  The RFC assessment is first used to determine whether a claimant can return to her past relevant work at Step 4 of the sequential evaluation.  20 C.F.R. § 404.1545(a)(5)(i).  If the adjudicator makes a finding that the claimant cannot return to her past relevant work, the RFC assessment is used at Step 5 of the sequential evaluation process to decide if the claimant can adjust to any other work that exists in the national economy.  20 C.F.R. § 404.1545(a)(5)(ii).

When assessing a claimant's mental RFC, the adjudicator first assesses the nature and extent of mental limitations and restrictions and then determines the RFC for work activity on a regular and continuing basis.  Limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce a person's ability to do past work and other work.  20 C.F.R. § 404.1545(c).

## C.  Weighing Medical Opinions

### 1.  Treating Source

Under the regulations, the Commissioner is supposed to give controlling weight to the opinion of a treating source if it is well supported by medically acceptable diagnostic

techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(c)(2) and 404.927(c)(2).

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairments(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.. . . .  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.  20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).

If controlling weight is not given to a treating source, the following factors are considered in deciding the weight to give to any medical opinion:   (1) Examining relationship, with more weight given to the opinion of a source who has examined a claimant than to the opinion of a non-examining source; (2) Treatment relationship, with a focus on the length of the relationship, the frequency of examinations, and the nature and extent of the treatment relationship; (3) Supportability by relevant evidence, including medical signs and laboratory findings; (4) Consistency with the record as a whole; (5) Specialization; and (6) Other relevant factors, including the amount of understanding an examiner has of disability programs and their evidentiary requirements and the extent to which a source is familiar with the other information in the case record. 20 C.F.R. §§  404.1527(c) and 404.927(c).

> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based

to a greater degree on medical evidence, qualifications, and explanations for opinions, than are required of treating sources.

SSR 96-6P, 1996 WL 374180 at *2. (S.S.A)[5]

## 2. Consultative Examiner

In addition to the rules about treating physicians, opinions from examining physicians must be considered. *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017). Generally, more weight is given to the opinion of a medical professional who has examined a claimant than to one who has not. *Id.* (citing 20 C.F.R. § 404.1527(c). "And fundamentally, '[t]he ALJ cannot reject a medical opinion without an explanation.'" *Id.* (quoting *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000). *See also Accord Wright v. Colvin*, 789 F.3d 847, 852-53 (8th Cir. 2015)(opinions of examining medical professionals are given more weight than non-examining medical professionals) and *Gudgel v. Barnhart*, 345 F.3d 476, 470 (7th Cir. 2003)(ALJ can reject examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice).

## 3. State Agency Medical and Psychological Consultants

State agency consultants are highly qualified physicians and psychologists who are experts in evaluating medical issues in Social Security disability claims. They are members of a team that make determinations of disability at the initial and reconsideration levels of the administrative review process. SSR 96-6P, 1996 WL

---

[5] Social Security Rulings are not binding on the court, but may be consulted when the statute at issue provides little guidance. The Fifth Circuit has frequently relied upon the rulings in evaluating ALJ decisions. *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001)(citations omitted).

374180 at *2. They consider the evidence and make findings of fact on the medical issues, including the existence and severity of a claimant's impairments and symptoms, whether the impairments meet or equal a listed impairment, and the claimant's RFC. *Id.*

The regulations require that ALJs and the Appeals Council consider findings of fact made by state agency consultants as the opinions of non-examining physicians and psychologists. They are not bound by the opinions, but they may not ignore them and must explain the weight given to the opinions in their decisions. *Id.* The opinions of the state agency consultants can be given weight only insofar as they are supported by evidence in the case record, considering factors such as supportability of the opinion in the evidence, consistency with the record as a whole, including other medical opinions, and any explanation given by the consultant. *Id.* In appropriate circumstances, opinions from state agency consultants may be entitled to greater weight than the opinions of treating or examining sources. For example, a consultant's opinion may be given greater weight if it is based on a review of a complete case record that includes a medical report from a specialist in the claimant's particular impairment which provides more detailed and comprehensive information than what was available to the claimant's treating source. *Id.* at *3.

## DISCUSSION

As an initial matter, neither party noted that the ALJ gave no weight to the opinion of Dr. Maruvada that Plaintiff is permanently disabled by her mental impairments. The ALJ said that Dr. Maruvada noted that Plaintiff had a permanent disability, but provided no specifics. However, as discussed above, Dr. Maruvada saw

Plaintiff at the Beeville Mental Health clinic at least four times in 2014 and 2015. He completed an assessment on June 18, 2015 finding her permanently disabled after examining her the same day (Tr. 507, 550-551; D.E. 6-10 at p. 79; D.E. 6-11 at pp. 34-35). While the issue of whether a claimant is disabled is reserved to the Commissioner, it is unclear why the ALJ did not analyze Dr. Maruvada's records and medical opinion as those of a treating physician, or discuss why he did not consider Dr. Maruvada to be Plaintiff's treating physician. The ALJ's failure to do clearly runs afoul of the regulations.

In addition, the ALJ gave no weight to Dr. Capitaine's assessment of Plaintiff's impairments and ability to function (Tr. 23). Plaintiff argues that the failure to give any weight to Dr. Capitaine's opinion was error and that if the ALJ had done so, he would have found Plaintiff's mental RFC to be limited to a disabling degree. As discussed above, Dr. Capitaine, an examining physician, found that Plaintiff was limited by her mental impairments such that on a daily basis she could not consistently understand, remember, and carry out instructions and had no effective social interaction. The ALJ stated that he gave no weight to Dr. Capitaine's description of Plaintiff's functional limitations because the treating examinations through September 2015 did not support such limitations. The ALJ also noted that "very normal mental status examinations" since August 2014 did not support those limits (Tr. 23).

However, the record does not support the ALJ's conclusion. On January 8, 2014, while Plaintiff was oriented to time, place, and person, had remote and immediate recall, and was able to follow a conversation, her mood was described as "cooperative, depressed, anxious, terrified, and confiding." (Tr. 391; D.E. 6-9 at p. 9). Her grooming

was disheveled but appropriate. Her thought content was described as having persecutory delusions and visual and auditory hallucinations. Plaintiff also reported that being around anyone but her sister or her boyfriend made her heart beat fast and she denied any socializing, which supports Dr. Capitaine's assessment regarding Plaintiff's social interactions (Tr. 386, 388, 391; D.E. 6-9 at pp. 4, 6, 9).

In February and April 2014 Plaintiff's mental status examinations were essentially normal, but she consistently reported hearing voices, crying, and not wanting to do anything or go anywhere (Tr. 417, 408). On July 31, 2014 Plaintiff's mental status exam showed that her mood was dysthymic, she was distracted, and her attention and concentration were impaired (Tr. 396). While it is the province of the ALJ to decide conflicts in the evidence, substantial evidence does not support the ALJ's conclusion that Dr. Capitaine's assessment was entitled to no weight because her treating examinations were inconsistent with his conclusions and that she had "very normal" mental status examinations (Tr. 23).

The ALJ also cited the fact that Plaintiff testified that she has a couple of friends who came over to help her with housework as evidence that she is not as socially impaired as she claims. However, Plaintiff has consistently stated that being around strangers or groups of people causes her to have anxiety and that she does not like to leave the house for that reason. Thus, her testimony is not inconsistent with Dr. Capitaine's conclusion that she cannot maintain effective social interaction on a consistent and independent basis with supervisors, coworkers, and the public.

It is clear under the regulations that if the ALJ rejects the opinion of the treating physician he is supposed to analyze the opinions of the other examining and non-examining medical care professionals by the criteria listed in 20 C.F.R. §§ 404.1527 and 416.927, i.e., treatment relationship, supportability, consistency, specialization, and other relevant factors. Of these criteria, the ALJ discussed only the consistency of Dr. Capitaine's opinion with the record, and his findings in that regard are not supported by substantial evidence.

Finally, the ALJ gave substantial weight to the opinions of the state agency consultants who did not examine Plaintiff. They found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, and to maintain attention and concentration for extended periods. She also was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. The state agency consultants concluded that Plaintiff could understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings (Tr. 67-69, 78-80, 93-95, 107-109; D.E. 6-4 at pp. 9-11, 20-22, 35-37; 49-51). Notably, none of the State Agency physicians discussed Dr. Capitaine's findings, or weighed his opinion, although they had received his report (Tr. 61-69, 72-80, 86-95, 100-109; D.E. 6-4 at pp. 3-11, 14-22, 28-37, 42-51). The ALJ found that these conclusions

were supported by the medical evidence except for Plaintiff being "slightly more limited with the public." (Tr. 23).

However, as discussed above, the ALJ did not follow the regulations when he weighed the medical opinions in the record. He did not discuss whether Dr. Maruvada was Plaintiff's treating physician and either accord his findings controlling weight or explain why the findings were not entitled to controlling weight. He discounted Dr. Capitaine's findings without discussing the criteria listed in 20 C.F.R. §§ 404.1527 and 416.927. The ALJ gave substantial weight to the findings of the state agency consultants even though they did not examine Plaintiff, and did not address all of the evidence in the record. Because the ALJ based his RFC assessment on the opinions of the state agency consultants without adequately discussing the other medical opinions in the record, his decision is not supported by substantial evidence. Accordingly, the Commissioner's decision that Plaintiff is not disabled is vacated and Plaintiff's case is remanded for further consideration of the medical opinions in her case.

## CONCLUSION

Based on the foregoing, Plaintiff's motion to reverse the determination of the Commissioner and remand her case for additional administrative proceedings (D.E. 13) is GRANTED. The Commissioner's determination that plaintiff is not disabled is not supported by substantial evidence and is VACATED. It is further ORDERED that Plaintiff's case is remanded to the Social Security Administration for further proceedings consistent with this order. This order for remand is made pursuant to the fourth sentence of 42 U.S.C. § 405(g).

ORDERED this 14th day of March, 2018.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE